[No. C004154. Third Dist. Mar. 8, 1989.]

WILLARD WILL, Plaintiff and Respondent, v.
KENNETH KIZER, as Director, etc., Defendant and Appellant.

710

COUNSEL

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, Charlton G. Holland, Assistant Attorney General, Elizabeth C. Brandt and Michael V. Hammang, Deputy Attorneys General, for Defendant and Appellant.

Susan Townsend for Plaintiff and Respondent.

OPINION

MARLER, J.—Kenneth Kizer, Director of the Department of Health Services (Director and Department, respectively), appeals from the trial court's judgment ordering a peremptory writ of mandate. The dispute involves plaintiff Willard Will's eligibility for Medi-Cal benefits. When he applied, Will and his wife owned a commercial building in downtown Marysville assessed at $154,792 and appraised at $197,500. Although the building produced no income and attempts to sell it for $180,000 were unsuccessful, the Department concluded that Will's interest in the building made him ineligible for Medi-Cal. It determined that Will's building was "available" to him as a resource since he had never listed it for sale at its assessed value. The trial court, however, concluded that Will's good faith, but unsuccessful, effort to sell the property at its market value made the building "unavailable" as a resource.

We shall conclude that recent amendments to federal law governing Supplemental Security Income (SSI) benefits contain a "reasonable but unsuccessful sales effort" exclusion from an applicant's "available" resources. Furthermore, drawing our guidance from federal law, we shall measure the sales effort's "reasonableness" against the property's actual market value, not its tax assessed value. However, we note a failure by the trial court to make sufficient findings concerning the reasonableness of the sales effort. Accordingly, we shall partly affirm and partly reverse.

FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed. The Department's decision rejecting Will's administrative appeal adequately states the case.

"The claimant [Willard Will] is an 83-year-old man who suffered a stroke in 1965 which left him paralyzed on one side and unable to care for himself. He has required skilled nursing care in convalescent and skilled nursing facilities for the last 20 years. Since 1983, he has resided at Marysville Convalescent Hospital.

"The claimant purchased the property on D Street in Marysville during 1944. [Its assessed value for the year ending June 30, 1986, was $154,792.] It was rented until the last tenant left in December 1985. It was listed for sale with Jim Watson, a realtor, in August 1984 for $262,500. There were no offers until the price was lowered to $197,500. On October 31, 1986 an offer was made of $180,000, but that was conditional on a favorable market survey. The condition was not satisfied and the offer was withdrawn.

"A second contract to buy was entered into with the same buyers for $180,000 on January 12, 1987 conditioned upon the buyers obtaining financing which is acceptable to them. The terms and type of intended business were different from the first offer." The condition was not met, and escrow failed to close. The Wills summarily rejected the only other offer made, a $125,000 bid from different potential buyers.

"The Realtor, Jim Watson, has been active in advertising the sale of the property. The property is located in an economically poor downtown area of Marysville where there are at least 12 other retail commercial stores that are vacant with little prospect of selling or leasing at this time.

"Jim Watson has been a real estate broker for 25 years and specializes in selling commercial property. He is a qualified, but not a licensed, real estate appraiser. He has taken courses in making appraisals at Yuba College, Anthony School of Real Estate and from the Real Estate Board Office. He appraised the claimant's property on September 2, 1986 at $197,000. Earlier, on April 24, 1984, it was appraised by Ronald Carciere, MAI SRPA, at $250,000.

"The [Department] contends that Mr. Will is not eligible for Medi-Cal because the property reserve exceeds the property limit in the regulations of $1,700 for one person and $2,550 for two persons.[1] Also, the net market value exceeds the property limits even if the utilization exemption of $6,000 is allowed."[2]

---

[1] California Code of Regulations (formerly Administrative Code), title 22, section 50420, provides that a Medi-Cal family budget unit of one person was ineligible for benefits in 1986 if it held more than $1,700 in nonexempt property.

[2] California Code of Regulations, title 22, section 50427, states: "(a) Real property not exempt as a principal residence, . . . is other real property. [¶] (b) Other real property not ex-

"The claimant contends that he should not be considered ineligible for Medi-Cal due to excess property because the property is not currently an available resource to him and it is being properly utilized within the meaning of Welfare and Institutions Code . . . Section 14006(e).[3] The property

---

empt under any other section of these regulations shall be exempt if both of the following conditions are met: [¶] (1) The combined net market value of all other real property is $6,000 or less. [¶] (2) The owner meets the utilization requirement set forth in Section 50416. [¶] (c) Other real property with a net market value of more than $6,000 shall be considered as follows: [¶] (1) The first $6,000 of net market value shall be exempt if the owner meets the utilization requirements set forth in Section 50416. [¶] (2) The net market value in excess of $6,000 shall be included in the property reserve."

Unless the fair market value is proven *lower* than the assessed value, the regulations consider the assessed value *as* the market value. (Cal. Code Regs., tit. 22, § 50412.) "Net market value" is the market value, as defined above, minus the encumbrances. (Cal. Code Regulations, tit. 22, § 50415.) Since the assessed value was lower than the fair market value, and no encumbrances existed, the net market value of Will's property was the assessed value of $154,792. The regulations equate the "net market value" with the "equity value." (Cal. Code Regs., tit. 22, § 50415, subd. (a).)

[3] California Code of Regulations, title 22, section 50402, states: "Property which is not available shall not be considered in determining eligibility."

Welfare and Institutions Code section 14006, subdivision (e) states: "If the holdings are in the form of real property, the value shall be the assessed value, determined under the most recent county property tax assessment, less the unpaid amount of any encumbrance of record. [¶] If the real property other than the home is not producing income reasonably consistent with its value, the applicant or recipient shall be allowed reasonable time to begin producing such income from the property. If the property cannot produce reasonable income or be sold based on the market value, the applicant or recipient shall be allowed to submit evidence from a qualified real estate appraiser which indicates the value for which the property can be adequately utilized or sold. If the applicant or recipient provides evidence that the only method of adequately utilizing the property is sale, and the property has not been sold at market value during a reasonable period of time, the property shall be considered to be adequately utilized provided it is listed with a licensed real estate broker at the value determined to be the fair market value by a qualified real estate appraiser and the applicant or recipient provides evidence that bona fide and continuous effort is being made to sell the property."

California Code of Regulations, title 22, section 50416, amplifies the "utilization" requirements. That section, in part, states: "(a) Other real property, as specified in Section 50427(b), shall be utilized in order to be exempt unless the net market value, when added to the net market value of other nonexempt property, falls within the limits set forth in Section 50420. [¶] (b) The property is utilized if any of the following requirements are met: [¶] (1) The beneficiary is receiving net yearly income from the property of at least six percent of the net market value of the property. . . . [¶] (2) The property has been sold, or the sale is in escrow and there is a bona fide attempt to close the sale. [¶] (c) The applicant or beneficiary shall be allowed six months to meet utilization requirements. The six month period shall be known as the utilization period, and shall begin on the first of the month following issuance of a notice of action informing the applicant or beneficiary that the property is not yielding sufficient income, as required in (b). The utilization period shall be stayed during periods of ineligibility in accordance with (1). [¶] (d) The utilization period may be extended for a maximum of one year for good cause, as specified in Section 50417. [¶] (e) The utilization period shall be extended for as long as the property is listed for sale, provided all of the following conditions are met: [¶] (1) The county department determines that utilization requirements can only be met by sale of the property. This determination shall be made using evidence provided by the applicant or beneficiary, which may be, but is not limited to, either of the following: [¶] (A) A written statement from a qualified real estate appraiser which gives the appraisal value of the

had been on the market for two years at the time of application without any offers. There has been good faith effort to sell it, lowering the price from $262,500 to $197,500 and accepting two conditional offers of $180,000, which is lower than the appraised value."

On September 11, 1986, Will's wife applied for Medi-Cal benefits in Sutter County on her husband's behalf. Sutter County, as the Department's agent, denied the application. Upon Will's request, the Department held a fair hearing on the denial on March 20, 1987. Following the hearing, the administrative law judge's proposed decision concluded that Will was ineligible for Medi-Cal benefits due to the availability of real property in excess of his property reserve. The Department adopted the proposed decision on April 3, 1987.

On May 21, 1987, Will petitioned for a writ of administrative mandate. On May 27, 1987, the superior court issued an alternative writ. The Department filed its return and the matter was heard on January 15, 1988.

The trial court found that Will's property had both a "real market" and a "fair market" value of $175,000 to $180,000. The court determined that the Wills "exercised good faith in their attempts to sell the property." The court also noted that the Wills' "rejection of [the] $125,000 offer for the property out of hand did not constitute a failure to exercise good faith in that the offer was substantially below any reasonable value of the property." The court concluded that Will's "property was unavailable with[in] the meaning of the statutory scheme for the aid sought by [Will]" and granted the petition.

On January 25, 1988, the peremptory writ of mandamus issued. On March 24, 1988, the Director timely appealed.

property and its income potential. [¶] (B) A certificate of condemnation. [¶] (2) The property is listed for sale with a licensed real estate broker at the market value, as determined in accordance with Section 50412(a). [¶] (3) The beneficiary provides the following evidence every six months, and at any other times it is requested by the county department. [¶] (A) A statement from the real estate agency that no bona fide offer has been rejected. [¶] (B) Copies of any offers that have been submitted and the reasons for rejection. [¶] (C) Evidence of the efforts being made to advertise the property for sale. [¶] (f) If the applicant or beneficiary utilizes the property by sale, the property shall be sold for at least market value, unless the property was sold under either of the following situations, and the applicant or beneficiary submits evidence that there was a bona fide attempt to sell at market value. [¶] (1) The property was listed with a licensed real estate broker for at least three months and the final sale price was similar to comparable sales in the area. . . . [¶] (i) The applicant or beneficiary may arrange for a reassessment of the property during the utilization period. The assessment shall affect utilization as follows: [¶] (1) The reassessment value shall be used in determining utilization requirements. [¶] (2) The reassessment shall not affect the beginning date or the length of the utilization period. [¶] (j) The entire net market value of the property not utilized in accordance with this section shall be included in the property reserve on the first of the month following the last month of the utilization period."

DISCUSSION

■ Where, as here, the facts are undisputed and the case concerns the proper application of a statute or administrative regulation, an appellate court is not bound by the trial court's determination. (See, e.g., *A.H. Robins Co.* v. *Department of Health* (1976) 59 Cal.App.3d 903 [130 Cal.Rptr. 901]; *Shoban* v. *Bd. of Trustees* (1969) 276 Cal.App.2d 534, 541 [81 Cal.Rptr. 112].) ■ Stated with deceptive simplicity, the sole issue presented is the eligibility for benefits of a Medi-Cal applicant who owns a building that he has been unable to sell at its appraised value when that value is substantially higher than the assessed value.

Because Medi-Cal is the California incarnation of the federal Medicaid programs, both state and federal law governs eligibility. Before focusing on the specific statutes and regulations disputed by the parties, we shall place the dispute in a broader statutory context.

In *Atkins* v. *Rivera* (1986) 477 U.S. 154 [91 L.Ed.2d 131, 106 S.Ct. 2456], the United States Supreme Court outlined Medicaid's general statutory scheme. "[¶] Medicaid, enacted in 1965 as Title XIX of the Social Security Act, 79 Stat. 343, as amended, 42 U.S.C. § 1396 et seq. (1982 ed. and Supp. II) is designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services. See *Schweiker* v. *Hogan,* 457 U.S. 569, 571, 73 L.Ed.2d 227, 102 S.Ct. 2597 (1982). The Federal Government shares the costs of Medicaid with States that elect to participate in the program. In return, participating States are to comply with requirements imposed by the Act and by the Secretary of Health and Human Services. See 42 U.S.C. § 1396a (1982 ed. and Supp. II); *Schweiker* v. *Gray Panthers,* 453 U.S. 34, 36-37, 69 L.Ed.2d 460, 101 S.Ct. 2633 (1981).

"States participating in the Medicaid program must provide coverage to the 'categorically needy.' 42 U.S.C. § 1396a(a)(10)(A) (1982 ed. and Supp. II). These are persons eligible for cash assistance under either of two programs: Supplemental Security Income for the Aged, Blind, and Disabled (SSI), 42 U.S.C. § 1381 et seq. (1982 ed. and Supp. II), or Aid to Families with Dependent Children (AFDC), 42 U.S.C. § 601 et seq. (1982 ed. and Supp. II).[ ] Congress considered these persons 'especially deserving of public assistance' for medical expenses, see *Gray Panthers,* 453 U.S. at 37, 69 L.Ed.2d 460, 101 S.Ct. 2633, because one is eligible for AFDC or SSI only if, in a given month, he or she earns less than what has been determined to be required for the basic necessities of life. AFDC and SSI assistance are intended to cover basic necessities, but not medical expenses. Thus, if a person in this category also incurs medical expenses during that month,

payment of those expenses would consume funds required for basic necessities.

"A participating State also may elect to provide medical benefits to the 'medically needy,' that is, persons who meet the nonfinancial eligibility requirements for cash assistance under AFDC or SSI, but whose income or resources exceed the financial eligibility standards of those programs.[] See *Schweiker* v. *Hogan,* 457 U.S., at 581-582, 73 L.Ed.2d 227, 102 S.Ct. 2597. Under 42 U.S.C. § 1396a(a)(17), the medically needy may qualify for financial assistance for medical expenses if they incur such expenses in an amount that effectively reduces their income to the eligibility level. Only when they 'spenddown' the amount by which their income exceeds that level, are they in roughly the same position as persons eligible for AFDC or SSI: any further expenditures for medical expenses then would have to come from funds required for basic necessities.

" . . . . . . . . . . . . . . . . . .

"A State electing to assist the medically needy must determine eligibility under standards that are 'reasonable' and 'comparable for all groups.' 42 U.S.C. § 1396a(a)(17). ██ In addition, and significantly for present purposes, state plans for Medicaid must describe 'the single standard to be employed in determining income and resource eligibility for all such groups, and the methodology to be employed in determining such eligibility which *shall be the same methodology which would be employed* under [AFDC or SSI].' 42 U.S.C. § 1396a(a)(10)(C)(i)(III) (emphasis added)." (*Atkins* v. *Rivera, supra,* 477 U.S. at pp. 156-158 [91 L.Ed.2d at pp. 137-138], fns. omitted.)

We pause here to note several points from *Atkins* v. *Rivera* germane to this appeal. First, neither party disputes here that Will is eligible, if at all, as a "medically needy" person. (See Welf. & Inst. Code, § 14005.7.) Second, under 42 United States Code section 1396a(a)(10)(C)(i)(III), California's Medi-Cal eligibility methodology must be for the "medically needy," the same used under AFDC or SSI. (*Atkins* v. *Rivera, supra,* 477 U.S. at p. 159 [91 L.Ed.2d at p. 138].)[4] Manifestly, a review of a state's Medicaid program

[4] While the methodology used to value resources must be the same, the income level above which there is no eligibility need not necessarily be the same in all three programs. As the Supreme Court noted in *Atkins* v. *Rivera,* "[t]he very purpose of [42 U.S.C.] § 1396a(a)(17) is to regulate the standards under which persons having incomes higher than allowed in the cash-assistance programs may still qualify for Medicaid; therefore, 'comparability' cannot be read to require that the standards must be identical with those in the cash-assistance programs. Because the medically and categorically needy are different in a fundamental way, this Court previously has recognized that the comparability provisions of Medicaid 'did not require that the medically needy be treated comparably to the categorically needy in all respects.' *Schweiker* v. *Hogan,* 457 U.S. 569, 587, 73 L.Ed.2d 227, 102 S.Ct. 2597 (1982). See *DeJesus* v.

invites comparison with its AFDC and SSI eligibility determination methodologies.

Title 42, United States Code section 1396a(a)(17) requires states participating in Medicaid to develop a plan that "include[s] reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan . . . ." In particular, those standards must "provide for taking into account only such income and *resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient* . . . [and provide for the] *reasonable evaluation of any such income or resources* . . . ." (42 U.S.C. § 1396a(a)(17)(B), (C), italics added.) ■■■ This "available resources" standard, the ultimate focus of our analysis, thus derives directly from the principal Medicaid statute.

California explicitly recognized these requirements by incorporating the above law into California law.[5] In the regulations adopted pursuant to Welfare and Institutions Code section 14006, California specifically excluded consideration of "unavailable property" in determining eligibility.[6]

The defendant agrees that if the subject property of Will is "unavailable" it shall be completely disregarded in determining eligibility. Defendant's remaining contention concerning "utilization" of the property only becomes relevant if the property is found to be "available." Since we find the property was "unavailable," we do not address these further contentions of defendant.

Neither the California statutes nor regulations define "availability." We therefore go to federal law as incorporated by Welfare and Institutions Code section 14006, subdivision (c). On December 22, 1987, Congress spoke on the issue. It enacted the Omnibus Budget Reconciliation Act (OBRA) of 1987 (Pub.L. No. 100-203, 101 Stat. 1330). Among other provisions of that massive act, Congress amended section 1613(b) of the Social Security Act. (Pub.L. No. 100-203, § 9103.) That portion of the Social

---

*Perales,* 770 F.2d, at 323-324; *Hogan v. Heckler,* 769 F.2d, at 891-897." (477 U.S. at p. 164, fn. 8 [91 L.Ed.2d at pp. 141-142].)

[5] Welfare and Institutions Code section 14006, subdivisions (a) and (c) state: "(a) This section applies to medically needy persons, medically needy family persons, and state-only Medi-Cal persons. [¶] (c) For purposes of determining eligibility under this part, resources shall be defined, counted and valued in accordance with the federal law governing resources under Title XIX of the federal Social Security Act (42 U.S.C. Sec. 1396 et seq.). Resources exempt under Title XIX of the federal Social Security Act . . . shall not be considered in determining eligibility. Medically needy individuals and families may retain nonexempt resources to the extent permitted under Title XIX of the federal Social Security Act . . . . In addition, the principal residence as defined in subdivision (b) shall be exempt."

[6] California Code of Regulations, title 22, section 50402, states: "Property which is not available shall not be considered in determining eligibility."

Security Act, codified at 42 United States Code section 1382b(b)(2)(C), discusses conditional payments of SSI benefits.[7] Section 1382b(b)(2) of 42 United States Code now exempts from the computation of resources any property that, as determined by regulations issued by the secretary of the United States Department of Health and Human Services, has not been sold despite the applicant's reasonable efforts.

On April 22, 1988, the secretary issued interim rules regarding the determination of "reasonable efforts to sell."[8] Those interim regulations unequivocally state: "Excess real property is not included in countable resources for so long as the individual's reasonable efforts to sell it have been unsuccessful." (20 C.F.R. § 416.1245(b)(1) [interim rule] (1988).) The interim rule continues: "Reasonable efforts to sell property consist of taking all necessary steps to sell it in the geographic area covered by the media serving the area in which the property is located, unless the individual has good cause for not taking these steps." (20 C.F.R. § 416.1245(b)(3) (1988).)[9]

---

[7] The SSI statutes and regulations provide for nine months of benefits to an applicant otherwise having excess resources. (See, e.g., 20 C.F.R. § 416.1242-416.1246 (1988).) These payments, however, are conditioned upon the applicant's execution of an agreement to sell the property. Upon the sale of the property, the applicant must pay back the benefits paid. (20 C.F.R. § 416.1244 (1988).)

[8] Those regulations appear as enforceable as final regulations. Such regulations are issued when the administrative agency determines that circumstances warrant the waiver of normal noticed rulemaking. (See, e.g., *U. S.* v. *Rainbow Family* (E.D.Tex. 1988) 695 F.Supp. 294, 302.)

[9] The interim text of Code of Federal Regulations section 416.1245(b) states in part: "*Reasonable efforts to sell.* (1) Excess real property is not included in countable resources for so long as the individual's reasonable efforts to sell it have been unsuccessful. The basis for determining whether efforts to sell are reasonable, as well as unsuccessful, will be a 9-month conditional benefits period described in § 416.1242. If it is determined that reasonable efforts to sell have been unsuccessful, further SSI payments will not be conditioned on the disposition of the property and only the 9 months of conditional benefits will be subject to recovery. In order to be eligible for payments after the conditional benefits period, the individual must continue to make reasonable efforts to sell. . . . [¶] (3) Reasonable efforts to sell property consist of taking all necessary steps to sell it in the geographic area covered by the media serving the area in which the property is located, unless the individual has good cause for not taking these steps. More specifically, making a reasonable effort to sell means that: [¶] (i) Except for gaps of no more that 1 week, an individual must attempt to sell the property by listing it with a real estate agent or by undertaking to sell it himself; [¶] (ii) Within 30 days of signing a conditional benefits agreement, and absent good cause for not doing so, the individual must: [¶] (A) List the property with an agent; or [¶] (B) Begin to advertise it in at least one of the appropriate local media, place a 'For Sale' sign on the property (if permitted), begin to conduct 'open houses' or otherwise show the property to interested parties on a continuous basis, and attempt any other appropriate methods of sale; and [¶] (iii) The individual accepts any reasonable offer to buy and has the burden of demonstrating that an offer was rejected because it was not reasonable. If the individual receives an offer that is at least two-thirds of the latest estimate of current market value, the individual must present evidence to establish that the offer was unreasonable and was rejected."

The introductory statement published in the Federal Register leaves no doubt that the secretary believes that OBRA's amendments to the Social Security Act substantially changed the secretary's prior practices in counting difficult-to-sell property. (53 Fed.Reg. 13254, 13255 (Apr. 22, 1988).) While the secretary's interim regulations continue to insist on a conditional payment period "to evaluate the reasonableness of the individual's efforts to sell," the secretary agrees that "once reasonable efforts have been demonstrated (as defined by the Secretary in regulations), and such efforts have proven unsuccessful, the individual's eligibility for SSI benefits is no longer conditioned upon the disposal of the individual's property; instead, *the property will not be counted as a resource and the individual will be eligible for SSI benefits for so long as he or she continues reasonable efforts to sell.*" (53 Fed.Reg. 13255, italics added.)

The interim rule requires the applicant to list the property at "no higher than the latest estimate of current market value." (53 Fed.Reg. 13255.) In addition, the applicant may not decline any reasonable offer to buy and must demonstrate that an offer was rejected because unreasonable. (20 C.F.R. § 416.1245(b)(3)(iii) [interim].) "If the individual receives an offer that is at least two-thirds of the latest estimate of current market value, the individual must present evidence to establish that the offer was unreasonable and was rejected." (*Ibid.*)[10] Defendant, in the face of the new federal authority, argues that Will still cannot prevail because he did not list the property for sale at assessed value,[11] and unreasonably rejected the offer of $125,000 for the property (over two-thirds of the finding of "real" and "fair" market value by the trial court).

The California regulations define "net market value" as the lower of assessed or appraised value, minus encumbrances. (Cal. Code Regs., tit. 22, §§ 50412, 50415.) However, no California statute, federal statute, or federal regulation regarding the "availability" of an asset in determining eligibility authorizes the use of assessed valuation. There is no California equivalent of OBRA and its implementing group of regulations. Welfare and Institutions Code section 14006, subdivision (c) requires the definition, counting, valuation, and exemption of a medically needy person's resources in accordance

---

[10] The interim regulations apply to "all individuals who filed for SSI benefits on March 1, 1981, or later." (20 C.F.R. § 416.1246(f) [interim].)

[11] California Code of Regulations states as follows: "(a) The market value of real property shall be (1) or (2), unless the applicant or beneficiary chooses to meet the conditions of (3), and (3) is lower: [¶] (1) The assessed value determined under the most recent property tax assessment, if the property is located in California. [¶] (2) The value established by applying the assessment method used in the area where the property is located, if the property is located outside of California. [¶] (3) The value established as the result of an appraisal by a qualified real estate appraiser, if the appraisal is obtained by the applicant or beneficiary and provided to the county department." (Tit. 22, § 50412, subds. (a)(1), (2), (3).)

with title XIX of the Federal Social Security Act (42 U.S.C. § 1396 et seq.) which now includes OBRA. ■ Further, 42 United States Code section 1396 (a)(10)(C)(i)(III) requires state Medicaid plans to describe the single standard to be employed in determining resource eligibility for AFDC or SSI under one methodology. (*Atkin* v. *Rivera, supra,* 477 U.S. at p. 158 [91 L.Ed.2d at p. 138].) ■ The California requirement of the use of assessed value for any "reasonable effort" to sell in determining the "availability" of property is unauthorized, and to that extent the regulation is invalid.

■ The final argument of defendant appears to have merit. As noted earlier, any rejected offer which is at least two-thirds of current market value places upon the applicant the burden of proving by evidence that the offer was unreasonable. (20 C.F.R. § 416.1245(b)(3)(iii) [interim].) There is no indication of such evidence or such a finding here. The trial court found, "The rejection of the $125,000 offer for the property out of hand did not constitute a failure to exercise good faith in that the offer was substantially below any reasonable value of the property."

The finding of good faith goes to the nature of the rejection by the applicant, not the nature of the offer, as required by the regulation. Further, the mere finding that the offer was below any reasonable value of the property does not address whether or not it was reasonable under the circumstances and as anticipated by the regulation.

The judgment is reversed and remanded for further trial on the sole issue of whether or not the rejection of the $125,000 offer was reasonable. In all other respects the judgment is affirmed. Each party shall bear its costs on appeal.

Puglia, P. J., and Sims, J., concurred.

A petition for a rehearing was denied April 4, 1989.